Good morning. Good morning, Your Honors. So I would like to please reserve at least three minutes for a rebuttal argument, and actually I'd like to allow most of my time to be used for any questions that the Court may have. Preliminarily, I was able to file a reply that I think best sums up the primary issues as to the First Amendment claim, as I understood was the Court's interest in having heard an oral argument specifically. Yes, I have a just, all right, fundamentally my understanding, and different counties do this differently, that in this particular county that the employees are at will in the DA's office. I don't know if the public defender's office is the same, and so when the, when things, the DA's an elected official, and when it changes, they can bring in their own people, and they can get rid of everyone if they want, correct? Absolutely. It's just like regular private at will employment. Okay, because I work for a public defender's office when I was in law school for a year and a half, and then I worked for a DA's office for ten and a half years, and we had more protection than that, and so, and I lived through where people had elections or things like that, and so it wasn't, it wasn't like a governor or a president where everyone comes and goes. So, that being said, obviously, Mr. Budine, is that how you pronounce it? Yes. When he was elected, he had a different philosophy than the prior person that was in the office, and, I mean, some people would have termed him, he's no longer there, is my understanding, but that perhaps is what would be a more progressive DA, and so he would be able to have the people in his office that would be consistent with his values or how he sees prosecution, and Mr. Ostley and he had had trials together, not always happily, and it would be safe to say that Mr. Ostley would not be a person that he probably would have kept anyway. Okay. That is not necessarily, he seemed to be, Mr. Ostley seemed, would be a more traditional prosecutor, and Mr. Budine seemed to be a more progressive prosecutor, so let's assume that he could have gotten rid of him. So, from a First Amendment perspective, if he got rid of him because he was retaliating against him for exercising his First Amendment right, what exactly, from your perspective, is the evidence here? And if, let's say he could get rid of him anyway, how does his retaliation factor into that? Absolutely, Your Honor. So, yes, there's this idea of at-will employment so that Mr. Ostley could have been terminated for any reason, or even no reason at all, but not an illegal reason. So that is a right that is subject to a number of exceptions, public policy exceptions, statutory exceptions, like the First Amendment. So, if his motivation was not just because he had a different philosophy, but was for something more specific, was for, was essentially a form of retaliation for Mr. Ostley's... Okay, a bunch of people got, he got, Mr. Budine got rid of a bunch of people in the first few days, right? How many people? Do you know? Well, and that, so there was only a few the first few days, and then there was a delay, and then there was other layoffs after the fact. But here's the... Are they layoffs or firings? I mean... Sure, firings, you're right, to be, yes, yes, that's more... So if, let's just say that he, that part of his motive was because he didn't like that Mr. Ostley, I guess, complained about the Defender's Office not conveying plea bargains to the clients. And also, I think that the Public Defender's Office was filing complaints against DAs, and, I guess, essentially intimidating them from exercising their independent duty to how to handle their cases, because if they handled them contrary to how the Public Defenders liked it, then they get a complaint with the State Bar, right? Are those the areas that he's talking about? Yes, yes. I mean, there's two primary issues in terms of the First Amendment speech. There was the reporting to the press of the fact that Public Defenders were not communicating settlement offers to their clients. So that was the first one. The second one was complaining of the fact that, yes, Public Defenders were using the bar complaint system as a means of intimidating and harassing prosecutors to prevent them from doing their job. And that's something even that in, I'm sorry? I think Judge Graber wants to ask a question. No, no. I want to be sure you finished your answer to Judge Callahan before I ask a question. So there was, even going back to 2018, there was a change in policy in District Attorney Gascon's office about what to do with these types of complaints. And it was all having to do with a similar type of conduct at the time, which he put out a memo. It's one of the exhibits, one of the attachments, wherein it cites the Business and Professions Code and defines that when Public Defenders are engaging in that type of conduct, it's actually a violation of law in and of itself. And so that was one of the things that Mr. Rossley was complaining. I'm referencing that fact to show that it was, even in the paper, you know, in writing, that this was a whistleblower-type claim. This was a complaint about violation of law that affected the public at large, meaning, obviously... Well, because, obviously, a complaint just against Mr. Rossley, if you assume that's the only complaint, that makes it harder to be a First Amendment argument, because then he's sort of litigating a personal matter as opposed to something that's a public concern. And I, that is... Because Mr. Rossley did get a complaint against him, too, right? Yes, and so did some of his colleagues, which he knows by way of, you know, having spoken with them, to which he put in both his declaration and in his verified complaint. Now... I'd like, if I may, to ask a question on a slightly different topic. And that is, Mr. Boudin, in his Declaration No. 1, says that, essentially, that he didn't know of these complaints or whistleblowing activities or protected or potentially protected speech. And the district court went through a long explanation of why there was not a reasonable inference that he was aware of these things. So, what is your response to that? Why isn't that, under our case law, that there has to be something more than speculation to counter a sworn declaration that the person didn't know? So I ask myself that same question, Your Honor, and that's why most of the papers are devoted to reviewing the transcript from the oral hearing, because if you review that as compared to the court's ultimate written order, it looks like two different courts looked at the case. One court heard oral argument, one court wrote the decision, because... Well, counsel, oftentimes we put up straw persons in oral conversation as to... I'm not sure why that matters, because I'm asking sort of a factual question. What support is there in the record that reasonably shows that Mr. Boudin was aware of these alleged complaints? So, first of all, if you look at Mr. Ostley's, beyond just the verified complaint and declaration, his specific allegations, if you look at the attachments, the exhibits to Mr. Ostley's declaration, they tell the story chronologically if you just look at them one by one. So he tells a reporter in 2017 that public defenders aren't communicating settlement offers. That doesn't come out. That article doesn't come out until a few days after Jeff Adachi's passing. It comes out in March of 2019. Very shortly after, Mr. Callaway, who's in the public defender's office, puts out an article in a nonprofit paper explaining why the public defender uses the bar complaint process to go after prosecutors, almost as like a preemptive move to get around the issues that Mr. Ostley has been complaining about. Within days, another public defender, Iona Solomon, goes to court and accuses Mr. Ostley of prosecutorial misconduct, which is denied outright by the judge. Within weeks thereafter, there's an email from her internally in the public defender's office referring to a case that Mr. Ostley was involved in from 2013, a personal matter, completely unrelated, which she misrepresents, which she uses and calls him a monster. It has nothing to do with any pending case or any legitimate reason. It's basically  But in that email, there's no evidence of retaliatory animus for Mr. Ostley's speech, right? It has to do with a sexual harassment, wrongful termination, liable lawsuit involving his former law firm. This is my point. Right. It has nothing to do with anything legitimate at the job. They're looking for dirt on him. I know, but making that extra step that this email was sent as retaliatory animus for Mr. Ostley's reporting the lack of plea offers being conveyed to clients, that's speculation, right? Well, first of all, when you're talking about retaliation, you're never going to have someone come out and admit, yeah, I did that for retaliating. It's all circumstantial evidence. And this is just one part in the history of the document. So I wasn't going to end there. I mean, so that email goes to Daniel Harris, who then gives it to Peter Calloway. Now, Daniel Harris then goes to Sharon Wu, there's another email, the DA's office, and is trying to get Mr. Ostley removed from his cases. Nothing specific, just because the public defenders don't want him on the cases. Sharon Wu refuses. But counsel, if he's removed because public defenders don't like him, that's not a First Amendment issue, is it? It is if the public- I mean, whether they like him or they don't like him is a separate question. They could not like him because he eats them at scramble. I mean, the fact that they don't like him is, it seems to me, separate from the allegedly protected speech. I agree, Your Honor. But if they don't like him because of his whistleblowing, because of his complaining about what they're doing, both internally and to the public- But you still have to show us that there's evidence that Mr. Boudin knew that. And that's what I, just speaking for myself, I don't find a non-speculative nexus there. Here's your best argument, and this is to me, okay? That's what I'm going to say. And some of it, what Judge Chen called speculative, can be argued would be circumstantial evidence of retaliatory intent. And what, you're right, no one ever comes out and says, I'm retaliating. That or, it's sort of like in a case, if a defendant, there's a specific intent required. It's not, the defendant doesn't have to say, oh, I'm specifically intending to do this to prove that the defendant did so. What, the things that you're mentioning are not necessarily tying to the speech. But what, in my mind, what they tie to is the public defender's office and the DA's office, and having worked in both, they all know what's everyone else. And I believe that where it becomes less speculative is it under, it somewhat impeaches Mr. Boudin's statement that he had no idea that this was going on. Because, and this I could be relying on some of my own experience, but if the offices are taking particular positions against, say, a judge, where they're filing 170.6 is against a judge, they all talk about it, and then everyone does a blank at 170.6. If they, if let's say the process is we're going to complain to the state bar about all of the DA's. It's hard for me to believe at one moment that that's not something that's being discussed strategically in the offices. Those offices are in court with each other every day, all the time, and the way they wage war against each other can be strategic. So, I think your best argument, to me anyway, is that how they operate and how, not so much that that's evidence that you're, that the retaliation, that it ties it to the First Amendment, it's that Mr. Boudin impeaches that whether he knew about the reports to the press, the reports to the state bar. I 100% agree, not just because he was on some of those emails that were being circulated internally, but of everybody that the public defender is going to to try and get Mr. Ostley removed. It's kind of, it would be strange to think they wouldn't go to the one person that could actually help them to do that once he becomes DA. His declaration, and I want to address Your Honor's question. Was he running at the time that all of these things were going on? I believe so. That wasn't, but I don't. That's not in the record? No. I don't, that's not a part of, that's not the connection. Here's the connection. The declaration itself is what I think undercuts his argument. Notice he doesn't say no public defender ever asked me to do this, right? His declaration says, despite being at will, which he could have just said, and probably should have at his own best interest, he says, I let Mr. Ostley go because of my experience with him as what? Public defender. Because of coworker complaints. He's been DA only of less than a week. What coworker complaints? Public defenders. And complaints by citizens. Right? Which, again, to answer Your Honor's question, what? Would it have been on the campaign trail? What does any of that have to do with whether or not he's suited to perform the job? It makes his declaration essentially creates the pretext, some of the circumstantial evidence to which Your Honor referred earlier, because it makes no sense. First of all, three or four sentences of hearsay doesn't provide a single name or record of an employee complaint, of a citizen complaint. Counsel, counsel, he does start. His first reason is that he was released from an at will position. And then he says he also had other motivations. But the primary thing he says is this was at will, which is true. And I'm not really sure how having other motives really changes that. It's sort of like the situation where someone is stopped for a legitimate traffic reason, and it also happens that the officer can't understand this guy's cousin. It doesn't take away from the fact that it's legitimate. And so I wonder why that first sentence, it doesn't sort of trump the rest of it. I have a question. As a matter of law, if part of the reason was retaliatory, but part of the reason was at will, what would a jury, what's the law on that? That's the point, is the jury has to have the opportunity to hear whether or not the other non-legitimate reason argued for the reason for termination was a substantially motivating factor. You doesn't have to be, does it have to be primary or does it have to be, is the law substantially motivating? What is the law on that? Because let's say he has two reasons. It doesn't have to be the primary. I don't like the type of DA that you are. Okay. And that would be okay. But I really didn't like that you went to the press. I don't like that you complained about, because public defenders were not conveying plea bargains, which I think is, I think is something of public concern because you don't want judges taking pleas from people if they've been offered something better and then they get convicted at trial. And then you have to like, say, for example, they got offered a manslaughter and then they go to trial and they get convicted of murder and I have to sentence someone to a life sentence. I can't then make it a, I can't make it a, a voluntary manslaughter. And then they can file a habeas and then it puts doubt on the whole integrity of the system. So I think that's a public concern issue. But Chronicle article doesn't mention Mr. Ostley, correct? And there wouldn't be, how would, how would anyone know that this March 4th, 2019 Chronicle article actually involved Mr. Ostley at all? If you look at the article, it just says a defendant spoke to the reporter and told him about, told the reporter about the defendant's case and then actually has quotes from the record of the judge speaking. Yes. Because as the Court just acknowledged a moment ago, it's a small community between the DAs and the public defenders. They know each other's cases. They work on each other's cases. And this case in particular that the reporter commented on was one that Mr. Ostley was involved with. They would have known it was him who provided the information because in this case demonstrates exactly why it was Mr. Ostley acting as a private citizen on a matter of public concern, or at least operating outside of the normal course of business, because that was the case where the defendant was accused of basically stealing and selling some Beyonce tickets. The plea bargain was not communicated to him. That was, once that happened, he got new counsel. Mr. Ostley actually testified on his behalf. Now, that is not something that is required for him, nor I think had ever been heard of within the district attorney's office, that he felt that there was an injustice done and testified on behalf of the defendant at the ineffective assistance of counsel hearing. That's, that type of case is one that they all would have known of because that was also one that, you know, was very severe in terms of the allegations that were being made against the public defenders for not communicating a settlement plea deal. Well, we've taken you over. Let me see if my colleagues have any additional questions. No, thank you. Okay, I'll give you two minutes for rebuttal since we obviously utilized a fair amount of your time to answer our questions. Okay, we'll hear from the county and the city. Thank you. Good morning, Justices. Thank you for the opportunity. I wanted to start off What's your name? My name is Peter Cownan. I'm the Assistant Chief Labor Attorney for the City and County of San Francisco. Okay, thank you. Good morning. Good morning. I'd like to start off by emphasizing a point, Justice Callahan, that you raised, which is this is an occurrence that is common in San Francisco, where when we have a new in the district attorney's office who comes in, they look at the staff and they make decisions about, at the very first week, which of those individuals they want to keep. What happened with Mr. Ostley is not uncommon. It's happened before and it happens after. The question that the city poses for this bench is, in those circumstances, when we have allegations of retaliation, what evidence does the employee need to show to survive summary judgment? Well, when you grant summary judgment, okay, you basically say no reasonable juror would find in someone's favor, okay? So let's just assume for a moment that I'm a reasonable juror and I'm saying I'm seeing a lot of circumstantial evidence that there was a retaliatory motive based on, yeah, that he could get rid of them and I think that Mr. Ostley and Mr. Bodine cleared to be completely different type of DAs and that's an ongoing thing in society. And then he probably got voted out of office because people said, you're too progressive and that, you know, the people get to speak on that. So it's an ongoing thing. So if that's all there is, I'm completely with you. But since I have a hard time, you know, perhaps having been a trial judge, sentencing people and obviously you want to believe that plea bargains are, you don't want to take a plea from someone if they don't have all the information. You know, that's, and I don't think society wants the courts accepting pleas or supporting convictions or sentences when the defendant has not had a proper opportunity to have all the information. That's it. Because not only does it make us not believe in the system, it also undermines that there's a likelihood of granting a new trial, granting a habeas, any number of things because it's not fair to the defendant. We don't want that to happen to defendants. And so there is a component of that here. And also too, prosecutors have a ton of power that I think we can all acknowledge. We don't want prosecutors exercising that power in an intimidated way because they represent what's called the people of the state of California. That includes the defendants, it includes any alleged victims, and it includes all of us sitting out there. We want prosecutors making independent decisions based on the against DAs, not just Mr. Ostley. And there's, and that would concern me. That concerns me that if I get arrested, that those prosecutors are going to be afraid to make an independent decision if they think they're going to have to go to the state bar. So why aren't those issues of public concern? Justice Conlon, I wouldn't, sitting here today, or standing here today in front of you, I wouldn't even focus you on the public concern aspect. I would focus... You concede it? You concede that's a matter of public concern if the public defenders are not conveying plea offers to clients? If it's a systematic issue that he is going to the press on and saying, systematically, I see evidence, not just in my cases, but in many different cases. Why does it have to be systematic? If there's one public defender who's doing that for all, however many clients he has, why isn't that a matter of public concern? I think the direct answer is that it would still be a matter of public concern. My issue is that it would, as a result, though, of that activity, the activity that he is pursuing or conducting as a result of his job as an assistant district attorney. It is not as a private citizen. And that's the import, particularly in this case. But it's not part of his job to whistleblow on misconduct in another office of which he's not a member, right? I would agree with you if he's a whistleblower of other assistant DAs in his own office, right? That might be part of his job duties, but how is it part of his job duties to be a whistleblower in an entirely separate office? I apologize, Justice. I'm not sure I follow. The way I, if I could, the way I see it is that why, if it's only, if Mr. Ostley was speaking as he was, as to the cases he individually was prosecuting, and he's complaining about the activities of the assistant or deputy public defenders across the bar, then those are specific to his case. Well, but they were, but other public, but public defenders were complaining about other DAs too, not just him, right? They were just filing complaints against DAs. With the State Bar. The evidence before this Court is that a State Bar complaint was filed by the public defender's office against Mr. Ostley. And Mr. Ostley, in conclusory fashion, asserts that he believes there were filings against other individuals as well. But my recollection is that there is no evidence about other ADAs being, having State Bar complaints filed against them. Well, I guess if we're saying that's conclusory, and so, therefore, let's throw it out, you know, Mr. Bodine saying he knows nothing about any of this, okay, if, if I'm a reasonable juror, and how those offices coordinate, and how, isn't this just a matter that the jury should decide, did he get rid of him because he was at will and not consistent with, you know, his view of how prosecutors should be, or did he get rid of him substantially for the reason that this guy, Mr. Ostley, had a complaint, you know, it, there's, you don't have to be a rocket scientist to link him, I think, as the, as your friend on the other side said, to being the person that was talking to the press and the, and the court. I mean, these offices, they, they coordinate with each other. They see each other every single day, and they talk. I, I, you know, it, it's hard for me to look at straight face. Now, I would, there is that, you know, why can't a jury decide why Mr. Bodine did this? The, the only reason is because the plaintiff in this particular case has produced no evidence from which a jury can make that inference. Had they deposed Mr. Bodine, had they deposed anyone to say, hey, you're aware, generally, of what occurs, you, you, you meet these, you go to the 850 Bryant Hall of Justice, and you talk to individuals, if they had made any of those statements, perhaps that's a different question, but that's not before this court, nor was it before the district court. And I'd also like to point out one fact that has not been ever addressed, by my recollection, which is that the actions of the public defender, an adverse office to the district attorney's office, cannot be retaliatory employment actions. The only connection here is . . . But I don't understand that. Say that, say that again. I don't understand that. The appointing officer for the office of the public defender is the elected official of the public defender. He's the one who gets to make employment decisions about individuals within his office, within the public defender's office. The same is true for the district attorney's office. Per the charter, the appointed officer is the elected district attorney. They make personnel decisions. And that's Mr. Boudin in this case. Correct. And so if Mr. Ostley could tie Mr. Boudin to some of this, which, as the court — as the Justices have already indicated, he could not. There is no evidence, and frankly, the evidence we've put in front of the Court is not simply a statement from Mr. Boudin saying, I was not aware of the activity Ostley's saying. He didn't say, let's take a look, because we just need to find a material factual dispute. He says, I do not recall being aware. And he doesn't disavow knowing about the San Francisco Chronicle article. He doesn't disavow knowing about Mr. Ostley's 2017 case where the public defender allegedly did not convey a plea offer to his or her client. So there's sort of, I don't want to say cagey, but there's certain ways that this declaration that is drafted, that you could make an inference another way. I hear, Justice, your point about — It's very lawyerly. It's very lawyerly. I don't recall. You can't be accused of perjury if you don't recall something. But if you said it didn't happen, then you could. Another view of that, Justice, though, is that this is a person who is saying, look, as I make this declaration, I don't ever recall being aware of any of these statements. And Justice Koh, you're correct that he doesn't call out specifically the Chronicle article. But what does he — what does — what he does say is that Mr. Ostley makes complaints about the public defender's office. Mr. Ostley makes complaints about the — about Sunshine Record requests and asking for public record acts. And Mr. Boudin makes clear that he's not aware of any of those. He doesn't recall ever being aware. And importantly, in conjunction with that statement of what he was not aware of, he makes the statements about why he — But why doesn't a jury just get to decide who they believe on that? I mean, I'm sure there were other people that Mr. Boudin let go that didn't have the history with — that he had with Mr. Ostley. So I'm sure there were other people that just — it was clean, said, hey, you're not my kind of DA, you're out of here. Because at the very minimum, the city would posture that there needs to be some evidence from which a jury can say that Mr. Boudin, first of all, was aware of this activity or somehow relied on or motivated by it. Well, they could disbelieve him. They could disbelieve him. They could have — there's a the circumstances of this, I find it improbable that you didn't know and that it wasn't part of your calculus. Or on the other hand, they could say, yeah, you knew about it, but I don't think that's what motivated you. Respectfully, I believe if that was to become the standard on summary judgment, then no defendant would ever win summary judgment in such a circumstance. But on the other hand, if I'm not a reasonable juror, because I think it's more — I think it's circumstantial evidence, but Judge Chen thinks it's speculative evidence, you have to say I'm not a reasonable juror. That's the bottom line. Is there any evidence — there's been a lot of conversation from opposing counsel about how everybody in the offices knew everything about everybody. And this took place two days, the termination took place only two days after Mr. Boudin took office, I think, something like that. It was very, very quick. And is there any evidence about conversations that took place or people meeting to try to figure out everybody's stance on different things? Or was this just lickety split? When you say people meeting, you mean within Boudin? Well, opposing counsel was saying that in an office like this, everybody knows everybody's business. And my question is, is there evidence that in two days, Mr. Boudin knew everybody's business? Or is that just a supposition? It's absolutely a supposition. And I would argue that the actual evidence here shows that Mr. Ostley, for instance, doesn't even know everything about the other side. Mr. Ostley testified — or their argument at the district court was that Mr. Boudin and a public defender, Solomon, shared an office together, and that he must have known of all Solomon's comments about Mr. Ostley because they shared an office together. And that's the subject of the second declaration, right? Correct. Simply to illustrate that not only was that speculation, but that was flatly incorrect. And I think the arguments here are — He did share an office for a few weeks in 2016, right? Correct. Okay. What evidence in the record is there that everybody knew everybody's business in the public defender's office? Is there any evidence in the record of that? The only evidence I'm aware of is a declaration — a self-serving declaration for Mr. Ostley himself, who says that he was familiar with everyone because they all worked around each other. But it's a generic 10,000-foot statement, not specific to any particular statement. Well, it is evidence. It's a question of what's the value of that. He does say that. He says that, correct. But also, there's the email that I think the woman sent to everyone in the entire office. So there is some evidence that they can communicate with everyone in the office, right? Absolutely. There's no dispute that there are all office-wide communications. Again, none of them talk about any of the alleged protected speech at issue here. Mr. Ostley's declaration, when he's saying everyone knows about everyone's business, is he referring to the public defender's office? I believe he is, Justice. And what's his basis to know what everyone in the public defender's office knows as an assistant DA? I have no idea. So I think Judge Graber asked a question about that the firing was pretty immediate. And the district court believed proximity was lacking between Mr. Ostley's speech and his termination. But couldn't a reasonable juror conclude that the gap in time was only because Mr. Bodine was not in a position to retaliate until they became part of the DA's office, and that is he fired Mr. Ostley two days after he got there? Isn't that a way a reasonable juror could look at it? Not within the context of Mr. Bodine's statement that he had no information as to any of those statements, as well as to the affirmative reasons why Mr. Bodine decided to release Mr. Ostley. Justice, as my time is up, may I make one comment about the affirmative defense? Sure. Just one point to emphasize here is that, separate and apart from the conversations about public concern, about whether he was doing this as a public employee or causation, the evidence before the court, as the district court, I believe, found, also explains via the declaration of Mr. Bodine his lack of knowledge and, more importantly, the basis for which he made the decision to release Mr. Ostley. So doesn't, but if he says that, isn't he deciding right there that he believes Mr. Bodine? I mean, which is what you don't do on summary judgment. You don't, I mean, you look at the evidence, but he must be deciding that he believes Mr. Bodine, that he didn't know. I believe that what the order does is to say that, in light of the affirmative evidence the has put forward by Mr. Bodine's declaration, and in light of the absence of any evidence that Mr. Ostley has put forward, the only fair and reasonable inference is that Mr. Bodine was not aware of Mr. Ostley's speech and was, in fact, motivated by the reasons he said in the declaration. So are you sticking to your guns, as it were, that Mr. Ostley was a private speaker? I am, no, I apologize. No, you're saying, well, I guess the district court also found Mr. Ostley mostly was not speaking as a private citizen because he was not speaking in contravention of orders by his superiors, but it seems there were no orders related to his speech. In that case, shouldn't the third Dahlia versus Rodriguez factor be neutral? I, I think the problem with that, that, pardon me, the, the various different speeches at issue here have different levels of analysis in terms of private speech or public employee speech. When we were talking earlier about the cases that Mr. Ostley was complaining about, it's the city's position in those cases that he was pursuing or carrying out his role as an assistant district attorney, and so he would not be a private citizen, speaking as a private citizen in those situations. I guess I have some trouble with the district court's finding that none of Mr. Ostley's speech was protected under the First Amendment. For instance, he told the press about public defenders not conveying settlement offer in one of the cases, which, if true, I think is fairly egregious conduct. So how is that speech not a matter of public concern? And, and your, and Justice, I agree, I agree that, that at least there is no justice on the Ninth Circuit. I apologize. Thank you, Your Honor. The explanation, I think, that the city would take in terms of the press statements is simply that the press statements, even if they were touching on matters of public concern, even if they were made as, by Mr. Ostley as a private individual, there is no evidence at all from which a jury or this court or the district court can conclude that Mr. Boudin was ever aware of those statements. And, in fact, the only evidence that exists is Mr. Boudin's statement under penalty of perjury that's uncontradicted, which says he does not recall ever being aware of those statements. And, frankly, that makes sense given that there's no allegation, and I believe the evidence shows Mr. Boudin was not the public defender sitting opposite Mr. Ostley on those cases. It was Ms. Solomon. And Ms. Solomon and Mr. Boudin, there's no evidence that they spoke about those cases and what was going on. Who was the public defender that wrote the office-wide email? It's one of two individuals. I don't remember exactly who. It's either Ms. Solomon, who is the public defender, or it was someone above her named Peter Calloway, who was charged with drafting the complaint. Okay. Do either of my colleagues have additional questions? No, thank you. Okay. Thank you for your argument. All right. You have two minutes. Thank you, Your Honors. I'll try and be succinct here. First of all, I want to distinguish between speculation and circumstantial evidence because, at least there's confusion on my part, maybe with some of the questions. So Mr. Ostley's declaration in the exhibits are circumstantial evidence. These are things that are within his personal knowledge, things he heard, things he saw. Why didn't you depose Mr. Boudin? That was a timing issue, frankly, Your Honor. We were going to, but in the end, it wasn't essential to us because they never deposed Mr. Ostley. Actions speak louder than words. We had the documents that we introduced. We had Mr. Ostley's verified complaint, his declaration. They didn't take his deposition. We felt no need. And what would be the point? Did you retaliate? No. Did you know? No. It would have just been denial, as was the declaration, which even casts more suspicion on the declaration. Why not be more specific? You don't have a lawsuit. It's your burden, right? Yes. Yes, it's our burden. And the burden was there. It's circumstantial. This is why I wanted to make the distinction. Okay? Speculation would be the things in Mr. Boudin's declaration because he's provided no evidence. Oh, there's coworker complaints, citizen complaints. My experience with him, there's nothing of substance. He doesn't say what he saw, what he heard, who complained. That's speculation. And as the court had pointed out- Imprecision, but it's not speculation. Speculation is sort of making something that there's no link. And therefore, something is speculative. If I say, I like breakfast food, but I don't tell you what specifically, it's not speculative. It's just not very precise, which is different, I think. And, Your Honor, the point is this, is that, as the Court said, this is something that should be decided by a fact finder, a jury, not a judge. These are circumstantial evidence. These are facts that a jury is free to disregard and disbelieve, Mr. Ostley. But at this stage, it never should have been denied. And the causation issue, that there's timing, if you look at just from the event starting in March all the way through, from the article, for all of the in-court accusations, to the bar complaint, to Mr. Boudin being elected and Mr. Ostley being terminated, to then having his fee agreement with the city immediately revoked, now giving basically Mr. Callaway and the public defender free reign to go ahead and pursue these bar complaints, because Mr. Boudin now has a policy of, we are going to use our discretion not to defend these folks, when that has been the history prior to defend them. And there is, counsel said, there's no evidence of another bar complaint. The redacted, they produced it. There is evidence. In the documents, there's a redacted complaint. You'll recall a document that says blank, blank, blank. And that was supposedly a complaint against somebody else, not Mr. Ostley. So it's not true to say that there wasn't other complaints. The request for public records, why would this have been an individual issue? Why was Mr. Ostley requesting every complaint by every public defender against every district attorney? This was not just unique to him. He was trying to get information. Kagan. But the first, in the first amended complaint, Mr. Ostley alleges that that Sunshine petition and that record search was for the defense of his own case, correct? He concedes that. Thank you. Yes. This idea that it can't be two things at once. Okay. Oh, I'm sorry. Okay. I'm sorry. We're not in a trial court here. I know. I know. The idea that this can't be two things at once is nowhere stated in any piece of case law. In fact, it's the opposite. Okay? An individual's dispute or issue can also be a matter of public concern, as was the case here. How do you separate the two? If the complaint is that the public defender is making false bar complaints against prosecutors, and I happen to be one of them, that's a, does that remove it from being a matter of public concern? No. So his request for records wasn't just related to the bar complaint against him. That's exactly my point. He went beyond. He was asking for other records. And the Sunshine ordinance even said, this was all prior to his termination, by the way. Preceded his termination. So if this was a request for records to the public defender's office, the fact that Mr. Boudin disclaims any knowledge of it creates a further question. Oh, so why were the public defenders not asked for records? Why did they ignore them? Okay. I think we have both of your arguments in mind. Thank you both for your arguments here today. Unless my colleagues have any additional questions, this will conclude the argument portion, and this matter will be submitted. Thank you.
judges: GRABER, CALLAHAN, KOH